1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DAVID E. MAYS, Derivatively on Behalf of Nominal Defendant JUNO THERAPEUTICS, INC.,<br><br>     Plaintiff,<br><br>  v.<br><br>HANS E. BISHOP, RICHARD D. KLAUSNER, ROBERT T. NELSEN, HOWARD H. PIEN, HAL V. BARRON, THOMAS O. DANIEL, ANTHONY B. EVNIN, MARY AGNES WILDEROTTER, MARC TESSIER-LAVIGNE, and STEVEN D. HARR,<br><br>     Defendants,<br><br>  and<br><br>JUNO THERAPEUTICS, INC.,<br><br>     Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND VIOLATIONS OF § 14 OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

Plaintiff David E. Mays, by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Juno Therapeutics, Inc. ("Juno" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and violations of § 14 of the Securities Exchange Act of 1934.

## NATURE AND SUMMARY OF THE ACTION

1.      Juno is a development stage biopharmaceutical company that focuses on immunotherapy to treat blood cancers. The Company is engaged in the development of product candidates using Chimeric Antigen Receptor Therapy ("CAR-T"). At relevant times, the Company's most important CAR-T product candidate was called JCAR015, which defendants claimed would treat Acute Lymphoblastic Leukemia.

2.      In the third quarter of 2015, the Company initiated a Phase II trial of JCAR015 referred to by the Company's management as the ROCKET trial. Critical to Juno's success was beating its competitors to market with its CAR-T products. According to defendants, JCAR015 was Juno's most advanced and most important product candidate. In order to be first to market with a CAR-T therapy, defendants adopted a "fast to market" strategy for JCAR015, which they claimed would allow Juno to launch the therapy in 2017.

3.      In December 2015, Juno's management decided to administer a combination of two chemotherapies, cyclophosphamide and fludarabine, to patients in the Phase II/ROCKET trial. These two therapies were given to patients prior to the injection of JCAR015, which, according to Juno's management, would increase the efficacy of the trial. By May or June 2016, the Phase II/ROCKET trial had enrollment of approximately 20 patients.

1

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

4.      On July 7, 2016, Juno's management disclosed that the U.S. Food and Drug Administration ("FDA") had forced the Company to halt the Phase II/ROCKET trial after one patient had died in May 2016 and two others died during June 2016.  Undisclosed to the public was that these patient deaths represented a shocking 15% death rate of Phase II/ROCKET participants.  At the time, defendants claimed that the FDA hold was no more than a bump in the road and that JCAR015 would still be available for a delayed launch in 2018.  News of the hold nevertheless caused Juno's stock price to drop over 30%.

5.      Defendants publicly blamed the patient deaths on the addition of cyclophosphamide and fludarabine to the study, and claimed that JCAR015 was safe and had not caused the fatalities.  Privately, however, due to an internal investigation initiated by Juno, defendants knew that the deaths were caused by neurotoxicity associated with JCAR015. Indeed, industry experts and publicly available studies established that cyclophosphamide and fludarabine showed no correlation with the cause of death of the three patients, cerebral edema. Additionally, cyclophosphamide and fludarabine were routinely used to treat lymphocytic patients like those in the trial without incidents of cerebral edema.

6.      Thereafter, defendants convinced the FDA to lift the clinical hold in return for the Company's assurance that it would no longer use fludarabine and would only use cyclophosphamide on patients in the Phase II/ROCKET study.

7.      From July through November 2016, defendants continued to repeatedly tell the public that the deaths were due to the intensity of the fludarabine and not JCAR015.

8.      On November 23, 2016, the truth began to be revealed when defendants caused Juno to announce that the Company had placed the Phase II/ROCKET trial on a voluntary hold

2

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

because two additional patients had died from cerebral edemas.  On this news, Juno stock fell 25%.

9.      In March 2017, defendants caused the Company to announce that it was ceasing development of JCAR015 due to the "toxicity" of the therapy.

10.     Defendants' concealment of the toxicity of JCAR015 and the Phase II/ROCKET deaths precipitated the filing of several securities class actions in the U.S. District Court for the Western District of Washington against Juno and certain of defendants. The securities class actions were eventually consolidated as *In re Juno Therapeutics Inc.*, C.A. No. 2:16-cv-1069-RSM (the "Securities Class Action").

11.     On June 14, 2017, U.S. District Judge Ricardo Martinez issued an order in the Securities Class Action denying defendants' motion to dismiss.  In the order, Judge Martinez held that a claim for securities fraud had been stated against Juno and certain of its officers, including defendant Hans E. Bishop ("Bishop"), the Company's Chief Executive Officer ("CEO") and President, and defendant Steven D. Harr ("Harr"), the Company's Chief Financial Officer ("CFO").  Due to the denial of the motion to dismiss in the Securities Class Action, it is now a near certainty that Juno will incur significant liability due to the fiduciary breaches committed by defendants when they concealed the truth about JCAR015.

12.     Defendants' breaches of fiduciary duties, however, include rampant self-dealing and are not limited to their misrepresentation of Juno's core business.

13.     Between June and the end of September 2016, while the truth about JCAR015 was known to defendants but concealed from the public, defendants Bishop and Harr sold over $15 million worth of their Juno stock at artificially inflated prices.

3

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

14.     In addition, at all relevant times, Juno's supposedly outside directors were granting themselves excessive compensation.  In 2015, the Company's non-employee directors granted themselves each approximately $550,000 in director fees while the Company's stock price fell by over 8%.  These director fees far exceed the amount of fees paid to non-employee directors at similarly-sized (and even much larger) companies.  According to a study of director compensation conducted by the Harvard Law School Forum on Corporate Governance and Financial Regulation, in 2015, median compensation for outside directors at companies the size of Juno was $197,750 per year, less than half the amount that Juno's directors took for themselves.

15.     In 2016, while they were misrepresenting the safety of JCAR015, the director defendants sought and obtained shareholder votes ratifying a non-employee director compensation policy that they had created, and which they then used to compensate themselves approximately $350,000 each during 2016, a year during which Juno's stock price fell by approximately 56%.  Accordingly, while overseeing massive drops in the price of Juno's stock, the Company's non-employee directors conferred upon themselves self-determined compensation far in excess of the levels paid to similarly situated directors at companies that had not suffered such large drops in stock price.

16.     Prior to filing this action, plaintiff did not make a demand on the Board, which is currently comprised of ten members.  Of the ten directors, eight are named as defendants in this action and two are not, due to their having been appointed to the Board after the wrongdoing.  One of the defendant directors is Bishop who, as a defendant in the Securities Class Action, would be interested in a demand to investigate his own wrongdoing.  Four additional directors

4

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

have significant business interlocks with Bishop such that they are reliant on him for continued access to lucrative related-party agreements and would not be able to independently consider a demand for action against him.  Further, all eight director defendants knew the truth about the dangers of JCAR015 due to their having conducted an investigation after the first patient deaths, but concealed same.  As a result, demand would be futile as to them.

17.     Demand is also futile due to defendants' self-dealing.  Six of Juno's ten current directors are non-employee directors who granted themselves the excessive compensation while the Company's stock price was plummeting.  These six defendants would be interested in a demand regarding their decision to grant to themselves compensation because they were on both sides of these transactions.  They would be interested in a demand to claw back the unwarranted and excessive compensation that they conferred upon themselves.

18.     At least half of Juno's current Board is not disinterested and independent and/or faces a substantial likelihood of liability in connection with the wrongdoing detailed herein.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

20.     Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Juno is headquartered in this District, and

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

defendants have received substantial compensation by engaging in activities that had an effect in this district and are directly related to the wrongdoing alleged herein.

## PARTIES

### A.    Plaintiff

21.    Plaintiff is a shareholder of Juno, has been continuously since December 2014, and continues to be.  Plaintiff is a citizen of California.

### B.    Defendants

22.    Nominal defendant Juno is an entity incorporated under the laws of the State of Delaware maintaining its principal executive offices at 400 Dexter Avenue North, Suite 1200, Seattle, Washington 98109.  Juno is biopharmaceutical company focused on developing cellular immunotherapies for the treatment of cancer.

23.    Defendant Hans E. Bishop ("Bishop") is a co-founder of Juno and has served as the Company's President and CEO, and a director, since September 2013.  Bishop is a defendant in the Securities Class Action.  Upon information and belief, Bishop is a citizen of Washington.

24.    Defendant Richard D. Klausner ("Klausner") is a co-founder of Juno and has been a director of the Company since August 2013.  Defendant Klausner is a non-employee director who received $552,752 in fees in 2015 and $598,890 in fees in 2016.  Upon information and belief, Klausner is a citizen of California.

25.    Defendant Robert T. Nelsen ("Nelsen") is a co-founder of Juno and has been a director of the Company since August 2013.  Defendant Nelsen is a member of the Compensation Committee.  He is a non-employee director who received $553,752 in fees in

6

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

2015 and $354,154 in fees in 2016.   Upon information and belief, Nelsen is a citizen of Washington.

26.     Defendant Howard H. Pien ("Pien") has been a director of the Company since January 2014, and Chairman of the Board since September 2014.   Defendant Pien is the Chairman of the Compensation Committee.   Defendant Pien is a non-employee director who received $582,752 in fees in 2015 and $381,396 in fees in 2016.   Upon information and belief, defendant Pien is a citizen of California.

27.     Defendant Hal V. Barron ("Barron") has been a director of the Company since September 2014.   Defendant Barron is a member of the Nominating and Governance Committee. Defendant Barron is a non-employee director who received $560,252 in fees in 2015 and $356,038 in fees in 2016.   Upon information and belief, defendant Barron is a citizen of California.

28.     Defendant Thomas O. Daniel ("Daniel") has served as a director of the Company since August 2015.   Defendant Daniel is non-employee director who received $100,000 in fees 2016.  Upon information and belief, defendant Daniel is a citizen of Tennessee.

29.     Defendant Anthony B. Evnin ("Evnin") has been a director of the Company since January 2014.   Defendant Evnin is a member of the Audit Committee and the Chair of the Nominating and Governance Committee.   Defendant Evnin is a non-employee director who received $565,818 in fees in 2015 and $358,898 in fees in 2016.   Upon information and belief, defendant Evnin is a citizen of Connecticut.

30.     Defendant Mary Agnes Wilderotter ("Wilderotter") has been a director of the Company since November 2014.   Defendant Wilderotter is the Chair of the Audit Committee

7

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

and a member of the Nominating and Governance Committee.  Defendant Wilderotter is a non-employee director who received $560,685 in fees in 2015 and $365,882 in fees in 2016.  Upon information and belief, defendant Wilderotter is a citizen of Nevada.

31.   Defendant Marc Tessier-Lavigne ("Tessier-Lavigne") was a director of the Company from January 2014 until August 2016.  Defendant Tessier-Lavigne was the Chair of the Scientific Committee and a member of the Compensation Committee.  Defendant Tessier-Lavigne is a non-employee director who received $568,252 in fees in 2015 and $361,565 in fees in 2016.  Upon information and belief, defendant Tessier-Lavigne is a citizen of California.

32.   Defendant Harr has served as Juno's CFO since March 2014.  Harr is a defendant in the Securities Class Action.  Upon information and belief, Harr is a citizen of Washington.

33.   The defendants named in ¶¶ 23 - 32 are sometimes referred to herein as the "Individual Defendants."

34.   Non-defendant director Jay Flatley ("Flatley") has served as director of Juno since 2017.  Flatley is a member of the Corporate Governance and Nominating Committee and the Compensation Committee.

35.   Non-defendant director Rupert Vessey ("Vessey") has served as director of Juno since 2017.  Vessey is a member of the Scientific Committee.

**DEFENDANTS' DUTIES**

36.   By reason of their positions as officers, directors, and/or fiduciaries of Juno and because of their ability to control the business and corporate affairs of Juno, at all relevant times defendants owed Juno and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Juno in a fair, just,

8

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

honest, and equitable manner.   Defendants were required to act in furtherance of the best interests of Juno and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Juno and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

37.    Defendants, because of their positions of control and authority as directors and/or officers of Juno, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their advisory, executive, managerial, and directorial positions with Juno, each of the defendants had knowledge of material non-public information regarding the Company

38.    Juno's Code of Business Conduct and Ethics ("Code") expressly designates defendants Bishop and Harr as the Company's official spokespersons for public comment, press, marketing, technical issues, and clinical and regulatory developments.   The Code imposes an affirmative obligation on these defendants and other authorized employees to provide complete, accurate, relevant, objective and timely information in connection with the Company's public reports and communications.

39.    To discharge their duties, the officers and directors of Juno were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of Juno were required to, among other things:

9

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

(a)  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)  Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## BACKGROUND

40.  Juno is a clinical-stage immunotherapy company that focuses on the use of Car-T therapy to treat blood cancer.  In CAR-T therapy, white blood cells are withdrawn from the patient and collected.  T-cells, which attack cancerous cells, are isolated from the white blood cells in a laboratory, and engineered to produce CARs, which destroy tumorous cells.  Typically, CAR-T therapy patients are first given standard chemotherapy, and the modified CAR-T cells are then injected into the patient to destroy cancerous cells.

41.  The Individual Defendants routinely told stockholders that JCAR015 was the core of Juno's business.  In the Company's Form 10-K for 2015, filed with the U.S. Securities and Exchange Commission ("SEC") on February 29, 2016 and signed by each of the Individual Defendants, these Individual Defendants described JCAR015 as *the most important* element of Juno's business.  In the first section the Form 10-K, these ten Individual Defendants disclosed:

10

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

## ITEM 1.        BUSINESS

### Overview

We are building a fully-integrated biopharmaceutical company focused on re-engaging the body's immune system to revolutionize the treatment of cancer. Founded on the vision that the use of human cells as therapeutic entities will drive one of the next important phases in medicine, we are developing cell-based cancer immunotherapies based on our CAR and high-affinity TCR technologies to genetically engineer T cells to recognize and kill cancer cells. We have shown compelling clinical responses in clinical trials using multiple cell-based product candidates to address refractory B cell lymphomas and leukemias, and we also have a number of ongoing trials exploring our platform in solid-organ cancers and in combination with various strategies to overcome the immune-suppressive effects of cancer. Longer term, we aim to improve and leverage our cell-based platform to develop additional product candidates to address a broad range of cancers and human diseases, including moving forward our pre-clinical product candidates that target additional hematologic and solid-organ cancers.

In the third quarter of 2015, we began a Phase II trial of JCAR015 that could support accelerated U.S. regulatory approval in adult relapsed/refractory ("r/r") B cell acute lymphoblastic leukemia ("ALL") as early as 2017….

\* \* \*

*JCAR015*

*Overview*.  JCAR015 is our most advanced development product candidate….

42.     In the Phase II/ROCKET trial of JCAR015, in December 2015 the Individual Defendants decided to introduce a combination of two chemotherapies, cyclophosphamide and fludarabine, to destroy existing T-cells prior to injection of JCAR015 into the patients enrolled in the trial.  Juno claimed that the cyclophosphamide/fludarabine combination would increase the efficacy of the Phase II/ROCKET trial.

### SUBSTANTIVE ALLEGATIONS

43.     On April 20, 2016, defendants Barron, Klausner, Nelsen, Daniel, Tessier-Lavigne, Wilderotter, Bishop, Pien, and Evnin issued a definitive proxy statement soliciting stockholder

11

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

votes in advance of the Company's annual meeting to be held June 16, 2016.  In the proxy statement, these nine Individual Defendants solicited stockholder votes in favor of four management proposals including: (i) a proposal to elect Barron, Klausner, and Nelsen to new terms as directors; and (ii) a proposal to ratify a new compensation policy for non-employee directors.

44.    The proxy statement disclosed that the Board had determined that defendants Bishop, Daniel, Klausner, were not independent directors.  Regarding corporate governance, the proxy statement stated that "[t]he Board has an active role, as a whole and also at the committee level, in overseeing the management of our risk.  The Board is responsible for general oversight of risks and regular review of information regarding our risks, including credit risks, liquidity risks, and operational risks."  According to the proxy statement, the Board maintained a Scientific Committee tasked with oversight of, among other things, the JCAR015 clinical program:

> **Scientific Committee**
> The members of our scientific committee are Drs. Barron, Daniel, Klausner, and Tessier-Lavigne.  Dr. Tessier-Lavigne is the chairman of our scientific committee. The purpose of the scientific committee is to assist the Board in fulfilling its responsibilities by reviewing and evaluating Juno's research strategy and research, development and clinical programs. To accomplish this purpose, the scientific committee reviews and monitors the science, processes and procedures, and infrastructure underlying Juno's major discovery and clinical development programs, and makes recommendations to the Board and/or management regarding the same.

45.    The proxy statement also disclosed numerous related party transactions between supposedly independent directors and the Company, including:

12

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel: (206) 223-2053
Fax: (206) 343-9636

(a)    A fourth amended and restated investors' rights agreements between a fund controlled by defendant Nelsen's primary employer, ARCH Venture Partners, and defendants Pien and Tessier-Lavigne.

(b)    A transaction between the Company and Fate Therapeutics, Inc. ("Fate") in which the Company paid Fate $5 million in cash, purchased 1,000,000 shares of Fate at $8.00 per share, and agreed to provide Fate with $2 million per year in research funding for four years. Defendant Nelsen's primary employer, ARCH Venture Partners, and defendant Evnin's primary employer, Venrock funds, each owned in excess of 10% of Fate.

(c)    A consulting agreement between the Company and defendant Klausner by which he would be paid $250,000 annually.

46. According to the proxy statement, defendants Bishop and Harr were paid approximately $5.3 million and $3.4 million, respectively, by Juno in 2015.

47. Regarding non-employee director compensation, the proxy statement told stockholders that each of Pien, Barron, Evnin, Klausner, Nelsen, Tessier-Lavigne, and Wilderotter, received compensation from Juno for their service on the Board during 2015 ranging between $552,752 and $582,752 each. The proxy statement stated that these excessive director fees were granted subject to a "2015 non-employee director compensation program" that was recommended by the Compensation Committee comprised of defendants Nelsen, Tessier-Lavigne, and Pien (who all stood to benefit from it) and approved by the Board (the majority of which stood to benefit from it). The proxy statement described no limit other than the Board's own discretion in setting payment amounts under the 2015 non-employee director compensation

13

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel: (206) 223-2053
Fax: (206) 343-9636

program, and the 2015 non-employee director compensation program was apparently never voted on by the Company's stockholders.

48.     The proxy statement stated that effective January 1, 2016, the Compensation Committee comprised of defendants Nelsen, Tessier-Lavigne, and Pien had recommended and the Board had approved a non-employee director compensation policy and asked stockholders to ratify the plan in order to "formalize the Company's policy regarding cash compensation and grants of equity to its Outside Directors."

49.     The non-employee director compensation policy provided for directors to be paid a cash retainer for service as a director with increases for membership on and/or chairmanship of Board committees.  According to the policy, however, the amount of cash compensation a director could be awarded was at discretion of the Board: "The Board in its discretion may change and otherwise revise the terms of the cash compensation granted under this Policy, including, without limitation, the amount of cash compensation to be paid, on or after the date the Board determines to make any such change or revision."

50.     Equity awards made under the proposed policy were *in addition to*, not instead of, any equity awards issued under the Company's 2014 Equity Incentive Plan.  Although the proxy misleadingly described the non-employee director compensation policy as containing limits on director compensation, there were no meaningful limits.  As described above, there was no limit on cash compensation.  And, while director equity compensation was purported to be limited to 50,000 shares per year under the policy, this limit did not include awards issued under the 2014 Equity Incentive Plan.  Additionally, the supposed limit under the non-employee director compensation policy of 50,000 shares of Juno was worth approximately $2.5 million when the

14

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

policy was adopted by the Board – an amount more than ten times the median annual outside director compensation for a company the size of Juno.[1]

51.    The 2016 proxy statement was materially misleading for the following reasons: (i) it misrepresented the Board's actual activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation; (iii) it misrepresented the non-employer director compensation policy as placing meaningful limits on non-employee director compensation, when it did not; and (iii) it failed to disclose that the compensation being conferred by Juno's non-employee directors on themselves was far in excess of the range provided to non-employee directors of similar sized, or even much larger, companies.  A reasonable shareholder would have found the truth to be material when deciding whether to vote for or against these proposals.

52.    During May 2016, although undisclosed at the time, one of the patients enrolled in the Phase II/ROCKET trial died of a cerebral edema.

53.    On June 17, 2016, the Company filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the 2016 proxy statement.  In particular: (i) defendants Barron, Klausner, and Nelson were reelected to terms as directors; and (ii) the Company's compensation policy for non-employee directors was ratified by stockholders.  The reelection of defendants Barron, Klausner, and Nelson and approval of the non-employee director compensation plan, based on the misleading statements contained in the 2016 proxy statement and other public filings was a fundamental link in these directors' continued breaches

---

[1]    *See https://corpgov.law.harvard.edu/2016/12/12/2016-director-compensation-report/*

15

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

of fiduciary duties and the continued enrichment of defendants at the expense of the Company's unaffiliated stockholders.

54.    On June 4, 2016, a few weeks after the first patient death in the Phase II/ROCKET trial, the Individual Defendants issued a press release about JCAR015, which did not disclose the death, but stated:

> [t]he ongoing efficacy and duration of response for a large percentage of patients, specifically those who do not go on to stem cell transplant, continues to be impressive . . . [t]hese findings provide us with further confidence about our development strategy and the ongoing Phase II Rocket pivotal trial.

55.    On June 7, 2016, defendant Harr attended the Jefferies Health Care Conference on behalf of Juno and stated:

> We have across multiple different studies now, somewhere between 82% and 100% complete remission rates.  And, in fact, with our most advanced product candidates and our current way we're treating patients, we've now treated 36 patients over the course of the last year in either adults or kids with ALL.[2]  And all 36 patients have not only a complete remission, but all 36 patients have the tougher bar of a complete molecular remission.  So, standard of care is kind of a 3% to 5% complete molecular remission rate. We're now at 100%.

> . . . JCAR015 is our fast-to-market strategy.  So, it's currently in a trial that, if positive, will serve as a registration study.  You can see we have a complete remission rate of around 80% and a complete molecular remission rate of 65%.

56.    On June 7, 2016, Juno filed with the SEC a Form 8-K containing a presentation representing a 66% complete remission rate for JCAR015 and a severe neurotoxicity rate of under 30%.

57.    On June 9, 2016, Bishop attended the Goldman Sachs Global Health Care Conference on behalf of Juno where he stated the following about JCAR015:

---

[2]    The term "ALL" when used by Company disclosures refers to Acute Lymphoblastic Leukemia.

16

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

So, our most advanced program is with the product candidate called JCAR015. It's an adult ALL.  It's currently enrolling a multicenter Phase II study which we plan to support approval, accelerated approval.

\* \* \*

So, we're very encouraged by that response rate in the 70% range.  Percentage of patients when you look at all-comers getting to a durable response in the 40% range.  JCAR015 by the way is pretty, for today, pretty conventional [CAR]-T cell technology, in that we do know selection of incoming cells from the patient. We take what we start with and make the product.

58.   Between June 9, 2016 and June 30, 2016, while the dangers of JCAR015 were known to the Individual Defendants, but concealed from the public, defendant Bishop sold 206,000 shares of Company stock for proceeds of $8,643,461.  These sales, which came at a time when Juno stock was significantly inflated due to defendants' deception, were significantly out of line with Bishop's recent stock transactions.  For example, in all of 2015 Bishop sold less than $4.2 million in stock.

59.   On June 10, 2016, defendant Harr sold 30,000 shares of Company stock for proceeds of $1,299,600.  Harr's sale was also out of line with his recent transactions in Company stock.  During 2015 and 2016 through May, Harr had acquired stock options but sold only approximately $225,000 worth of Company stock.

60.   On July 7, 2016, the Individual Defendants caused Juno to announce in a press release that the FDA had placed a total clinical hold on the Phase II/ROCKET trial after two patient deaths "last week."  According to the disclosures, over 20 patients had been enrolled in the Phase II/ROCKET trial, well below Juno's stated goal of enrolling over 50 patients.  Due to the small study size, the three deaths (one of which was as of yet undisclosed) constituted an approximately 15% rate of death from severe neurotoxicity associated with JCAR015.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

61.   Also on July 7, 2016, the Individual Defendants participated in a conference call to discuss the clinical hold.  For the first time, the Individual Defendants disclosed the May 2016 patient death when defendant Bishop mentioned it.  During the call, the Individual Defendants publicly acknowledged for the first time that all three patient deaths were the result of neurotoxicity associated with JCAR015.  Defendant Bishop stated that the May 2016 death was reported to the FDA and Juno's data safety monitoring board (an independent group of experts), demonstrating that the Individual Defendants were aware of the death, even though it was not disclosed to investors.  Bishop also stated that the addition of fludarabine as a pre-conditioning regimen in the Phase II/ROCKET trial increased the incidence of severe neurotoxicity that caused the deaths at the end of June 2016.  During a question and answer session at the end of the call, the Individual Defendants continued to conceal the dangers of JCAR015 itself by blaming the deaths on the addition of the cyclophosphamide/fludarabine combination:

> [Bishop]: ". . . we believe the addition of fludarabine when combined with JCAR015 is the most likely and the most appropriate modifiable factor.  Indeed, with [cyclophosphamide] alone, which we have used in the greatest number of patients treated in the ROCKET trial to date, there have not been any treatment-related deaths and the incidence of severe neurotoxicity is within the range of what we expected in light of the [Phase I] experience."

> [Chief Medical Officer, Mark J. Gilbert]: "If I was to just expand for a moment, the real key for us in our investigations is that the addition of fludarabine seemed to hasten the expansion so that its early, much earlier, and also much more rapid in its rise."

62.   On July 12, 2016, the Individual Defendants caused the Company to issue a press release announcing that the FDA had removed the clinical hold on the Phase II/ROCKET trial, and that the Company would continue enrollment under a revised protocol that only employed cyclophosphamide as a preconditioning regimen

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

63.    On August 4, 2016, the Individual Defendants conducted a conference call to discuss the Company's second quarter 2016 results.  During the call, Bishop told investors that the "intensity" of cyclophosphamide/fludarabine combination with JCAR015 caused the deaths.

64.    On September 13, 2016, Bishop attended the Morgan Stanley Global Health Care Conference on behalf of the Company.  During the conference, he stated:

> Our most advanced product candidate is JCAR015 which is being studied in adult ALL.  It was a trial where we had a setback in the last couple of months with some deaths in the trial.  I'm sure we'll cover that.  The Phase I portion of that trial gets about 35% to 40% of adults into a long-term remission and that, today, is clearly going to set a new standard of care.

* * *

> . . . And what we've changed in the protocol was the chemotherapy we use before we give the cells often referred to as the lymphodepletion regime. . . . [i]n our analysis, it was pretty clear that as we increase the intensity of the lymphodepletion, we saw this toxicity emerge.  Why?  We believe it is multi-factorial, but to try to and make this as understandable as possible, as you increase the intensity of lymphodepletion, the cells you gave then grow more quickly.  And we believe that the risk of this particular form of neurotoxicity is related to the speed at which the cells grow.  So, our recommendation to FDA was to remove fludarabine, in other words, reduce the intensity of lymphodepletion.  We've got over 40 patients' worth of experience with Cytoxan alone with JCAR015.  And we were encouraged that the benefit to risk of that with Cytoxan alone was acceptable.

65.    Between August 31, 2016 and September 27, 2016, while the dangers of JCAR015 were known to the Individual Defendants, but concealed from the public, defendant Bishop sold an additional 170,708 shares of Company stock for proceeds of $5,278,985.

66.    On September 29, 2016, Bishop attended the Leerink Partners Rare Disease & Immuno-Oncology Roundtable Conference on behalf of the Company. At the conference, Bishop stated:

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

I think the most important thing, before I come to your question on what happened, Michael, is to remind people that we treated about 50 patients in the Phase I trial with JCAR015 at Memorial.  The majority of those, more than 40 patients, were with the Cytoxan-alone pre-conditioning….  So we think the ROCKET trial, JCAR015, with Cytoxan alone, has got a very good chance of replicating that Memorial Phase I.  And if it does, it's on track for setting a new standard of care.

\* \* \*

…That clearly didn't play out in the ROCKET study, where we saw associated with the addition of fludarabine unacceptable levels of toxicity, including a number of patient deaths.  What happened, we believe, is that, if you increase the degree of lymphodepletion too much, which we clearly did, the cells expand quickly.  So, it's not the fludarabine per se that caused the toxicity.  It's the increase in intensity in the lymphodepletion, which led to these patients experiencing very, very fast cell expansion.

**The Truth is Revealed**

67.     On November 23, 2016, the Individual Defendants caused Juno to issue a press release announcing that the Company had voluntarily placed the Phase II/ROCKET trial on hold after two more patients died of cerebral edemas that week.

68.     On this news, Juno's stock price collapsed $7.32 per share, or nearly 25%, to close at $22.56 on November 23, 2016.

69.     Since November 2016, the Individual Defendants maintained the hold on the JCAR015 study, and, on ultimately on March 1, 2017, caused the Company to issue a press release announcing that the Company would cease development of JCAR015.  The press release quoted defendant Bishop as stating that the Individual Defendants "recognize the unfortunate and unexpected toxicity we saw in our trial addressing ALL with JCAR015.  We have decided not to move forward with the ROCKET trial or JCAR015 at this time."

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

70.    On April 24, 2017, defendants Barron, Klausner, Nelsen, Daniel, Wilderotter, Bishop, Pien, Evnin, and non-defendant director Vessey, issued a definitive proxy statement in advance of the Company's annual meeting to be held June 15, 2017.  According to the proxy statement, defendants Bishop and Klausner were not independent directors due to their relationships with Juno.

71.    In the proxy statement, defendants disclosed that "[t]he Board has an active role, as a whole and also at the committee level, in overseeing the management of our risk.  The Board is responsible for general oversight of risks and regular review of information regarding our risks, including credit risks, liquidity risks, and operational risks."   According to the proxy statement, during 2016 the Board maintained a Scientific Committee tasked with oversight of, among other things, the JCAR015 clinical program:

> **Scientific Committee**
> The members of our scientific committee are Drs. Barron, Daniel, Klausner, and Vessey. Dr. Tessier-Lavigne served as chairman of our scientific committee until his resignation from the Board in August 2016 due to his new obligations as the President of Stanford University. Dr. Barron is the current chairman of our scientific committee. The purpose of the scientific committee is to assist the Board in fulfilling its responsibilities by reviewing and evaluating Juno's research strategy and research, development and clinical programs. To accomplish this purpose, the scientific committee reviews and monitors the science, processes and procedures, and infrastructure underlying Juno's major discovery and clinical development programs, and makes recommendations to the Board and/or management regarding the same.

72.    The proxy statement also disclosed that the Company planned to enter a consulting agreement during 2017 with defendant Barron by which he would receive $100,000 per year in fees from the Company.

73.    The proxy statement further disclosed that, with the exception of defendants Daniel and Klausner, each non-employee director, defendants Pien, Barron, Evnin, Nelsen,

21

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

Tessier-Lavigne, and Wilderotter, received compensation from Juno for their service on the Board during 2016 ranging between $354,154 and $381,396 each.  Klausner received $598,890 in fees and Daniel received only $100,000 in fees.

74.     According to the proxy statement, defendants Bishop and Harr were paid approximately $3.8 million and $2.9 million, respectively, by Juno in 2016.  Of Bishop's compensation, over $3 million was in the form incentive compensation, and of Harr's compensation, over $2.5 million was incentive compensation.

## DAMAGES TO THE COMPANY

75.     As a direct and proximate result of the Individual Defendants' conduct, Juno has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

(a)     Legal fees incurred in connection with the Securities Class Action;

(b)     Any funds paid to settle the Securities Class Action;

(c)     Incentive compensation paid during 2016 to Bishop and Harr; and

(d)     Excessive director fees paid as a result of non-employee director compensation amounts approved by the directors who were to benefit from them.

76.     In addition, Juno's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

77.     The actions complained of herein have irreparably damaged Juno's corporate image and goodwill.  For at least the foreseeable future, Juno will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

illegal behavior and have misled the investing public, such that Juno's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

78.    Plaintiff brings this action derivatively in the right and for the benefit of Juno to redress injuries suffered, and to be suffered, by Juno as a direct result of breaches of fiduciary duty by the Individual Defendants.  Juno is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

79.    Plaintiff will adequately and fairly represent the interests of Juno in enforcing and prosecuting its rights.

80.    Plaintiff has continuously been a shareholder of Juno at times relevant to the wrongdoing complained of and is a current Juno shareholder.

81.    When this action was filed, Juno's Board of Directors consisted of director defendants Barron, Bishop, Daniel, Evnin, Klausner, Nelsen, Pien, Wilderotter, and non-party directors Flatley and Vessey.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons set forth below.

**Defendant Bishop**

82.    At all relevant times, Bishop was the Company's CEO and President.  Defendant Bishop's own statements misleadingly concealed the dangers of JCAR015 and he was well aware that the Company's public statements did so as well.  After the patient deaths due to JCAR015 but before truthful disclosure of the dangers of JCAR015, defendant Bishop sold over

23

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

$13 million worth of his Juno stock.[3]   Due to his statements and his stock sales, Bishop is a defendant in the Securities Class Action and his motion to dismiss the securities fraud claims against him was denied.  As a result, Bishop would be interested in a demand regarding his own wrongdoing and demand is futile as to him.

As alleged above, during 2016 defendant Bishop received over $3 million in short-term incentive compensation while he was breaching his fiduciary duties by misrepresenting the safety of JCAR015.   As recipient of these funds, he would be interested in a demand regarding their propriety   and   demand   is   excused   as   to   him   on   that   basis.

**Defendant Klausner**

83.    Defendant Klausner is a co-founder of Juno who, according to the Company's public disclosures, is not an independent director.   Due to his status as a co-founder with defendant Bishop, Klausner and Bishop have a long-term business relationship and Klausner is not independent of Bishop.   Indeed, during 2016, Klausner was party to a lucrative consulting agreement with the Company by which he earned $250,000.   Bishop, as CEO, is ultimately responsible for the hiring of consultants and Klausner is reliant on Bishop's goodwill to retain his access to this income in the future.   Accordingly, Klausner is not independent of Bishop and

---

[3]    Defendant Bishop has previously been a defendant in a securities class action in which he was alleged to have reaped significant profits from insider sales while negative information was being concealed.  In 2010 and 2011, Bishop was employed as the Executive Vice President and Chief Operating Officer of Dendreon Corporation ("Dendreon").  In 2011, Dendreon and certain insiders, including Bishop, were sued in a securities fraud class action alleging that they misled investors about the viability of a cancer drug that was precursor to the immunotherapies currently under development at Juno.  In the Dendreon securities class action, Bishop was alleged to have sold over 30% of his holdings while Dendreon stock was artificially inflated.  In 2013, Bishop and his co-defendants settled the Dendreon class action for approximately $40 million.

24

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

therefore would be interested in a demand regarding Bishop's wrongdoing and compensation and demand is excused to him on this basis.

**Defendant Nelsen**

84.     Defendant Nelsen is a co-founder of Juno.  Due to his status a co-founder with defendant Bishop, Nelsen and Bishop have a long-term business relationship and Nelsen is not independent of Bishop.  Indeed, due to his relationship with Bishop, as described in detail above, Nelsen has obtained lucrative and beneficial related party transactions with Juno.  These include an investors' rights agreement to which he is party, Juno's commitment to invest $21 million in an entity in which Nelsen's primary employer, of which he is a founder and managing director, owns a substantial stake and stands to benefit significantly.  Bishop, as CEO, ultimately directs Juno's investments and Nelsen is therefore reliant on Bishop's goodwill and indebted to him due to his decision to provide millions of Juno's funds to an investment of Nelsen's.  Accordingly, Nelsen is not independent of Bishop and therefore would be interested in a demand regarding Bishop's wrongdoing and compensation and demand is excused to him on this basis.

**Defendant Barron**

85.     During 2016, defendant Barron became a party to a consulting agreement with Juno entitling him to $100,000 in fees in addition to those he earned as a director.  By the Company's rationale in designating Klausner as not independent in the 2016 proxy statement, Barron is not independent now.  Defendant Bishop, as CEO, is ultimately responsible for the hiring of consultants and Barron is reliant on Bishop's goodwill to retain his access to this income in the future.  Accordingly, Barron is not independent of Bishop and therefore would be

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

interested in a demand regarding Bishop's wrongdoing and compensation and demand is excused to him on this basis.

**Defendant Evnin**

86.     Defendant Evnin has served as a partner of the venture capital firm Venrock since 1975.  Due to the benefits obtained from Bishop by Evnin for Venrock, Evnin is not independent of Bishop.  In 2015, Evnin obtained Juno's commitment to invest $21 million in an entity in which Evnin's primary employer, of which he has been a partner for over 40 years, owns a substantial stake and stands to benefit significantly.  Bishop, as CEO, ultimately directs Juno's investments and Evnin is therefore reliant on Bishop's goodwill and indebted to him due to his decision to provide millions of Juno's funds in an investment of Evnin's.  Accordingly, Evnin is not independent of Bishop and therefore would be interested in a demand regarding Bishop's wrongdoing and compensation and demand is excused to him on this basis.

**Scientific Committee Members Barron, Daniel, and Klausner**

87.     During 2016, defendants Barron, Daniel, and Klausner were members of the Scientific Committee when Juno's public disclosures were concealing the dangers of JCAR015. Due to their role as members of the Scientific Committee, Barron, Daniel, and Klausner had responsibility for oversight of the Company's clinical programs.  JCAR015, by the Company's own admission, was Juno's most important product candidate and Barron, Daniel, and Klausner can be inferred to have supervised this core element of the Company's business in their role as Scientific Committee members.  When the Company conducted an investigation into the reason for the deaths in the Phase II/ROCKET trial, the Scientific Committee supervised the investigation and therefore knew that in truth, it was JCAR015 that was toxic, not any other drug

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

used.  These defendants knew of the undisclosed deaths in the JCAR015 Phase II/ROCKET study and the dangers of JCAR015, knew the Company's disclosures were not truthful, and not only declined to stop them or issue corrective disclosures but also declined to hold Bishop or Harr accountable.  These failures were breaches of their fiduciary duties, and Barron, Daniel, and Klausner would be interested in a demand regarding whether they had discharged their duties as members of the Scientific Committee.

**Individual Defendants Bishop, Pien, Barron, Daniel, Evnin, Klausner, Nelsen, and Wilderotter**

88.     During 2016, defendants Bishop, Pien, Barron, Daniel, Evnin, Klausner, Nelsen, and Wilderotter were members of the Board when Juno's public disclosures were concealing the dangers of JCAR015.  Due to their role as members of the Board, these defendants had responsibility for oversight of the Company's core business.  JCAR015, by the Company's own admission, was Juno's most important product candidate and these defendants can be inferred to have supervised this core element of the Company's business in their role as Board members.  When the Company conducted an investigation into the reason for the deaths in the Phase II/ROCKET trial, the Board was provided the results and therefore knew that in truth, it was JCAR015 that was toxic, not any other drug used.  These defendants knew of the undisclosed deaths in the JCAR015 Phase II study and the dangers of JCAR015, knew the Company's disclosures were not truthful, and not only declined to stop them but also declined to hold Bishop or Harr accountable.  These failures were breaches of their fiduciary duties, and defendants Bishop, Pien, Barron, Daniel, Evnin, Klausner, Nelsen, and Wilderotter would be interested in a demand regarding whether they had discharged their duties as Board members.

**Non-Employee Directors Pien, Barron, Evnin, Klausner, Nelsen, and Wilderotter**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

27

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

89.     Non-employee directors Pien, Barron, Evnin, Klausner, Nelsen, and Wilderotter granted themselves excessive compensation of over $550,000 each in 2015.  This compensation was granted by these six defendants to themselves at their own discretion.  According to the Company's 2016 proxy statement, which these six defendants issued, the amount of this compensation was set by them exclusively and approved by them exclusively.  Director fees of over $550,000 for non-employee directors of company the size of Juno's are facially excessive.  According to the Harvard Law School Forum on Corporate Governance and Financial Regulation's 2016 Director Compensation Report (the "Harvard Report"), Juno was a "mid-cap" company in early 2015 due to its market then-market capitalization of under $5 billion.  The Harvard Report defines "mid-cap" companies as those with market capitalizations between $1 billion and $5 billion, and "large-cap" companies as those with market capitalizations over $5 billion.  According to the Harvard Report, in 2015, median non-employee director compensation for mid-cap companies was $197,750, and for large-cap companies was $259,583.  Moreover, a report issued in July 2016 but the Board's own compensation consultant, Willis Towers Watson, found that median non-employee director compensation at U.S. public companies was $263,491 in 2015.  According to the Willis Towers Watson report, the 75th percentile of total non-employee director compensation was $297,627 in 2015, and the amounts paid to the non-employee directors of Juno were the highest of any company examined.  Defendants Pien, Barron, Evnin, Klausner, Nelsen, and Wilderotter therefore paid themselves more than twice the median amount paid to similarly situated directors.  During 2015, while these six defendants were conferring this excessive compensation upon themselves, Juno's stock price declined 8.87% on the year.  As a result, defendants Pien, Barron, Evnin, Klausner, Nelsen, and

28

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Wilderotter breached their fiduciary duties by putting their interests before those of the Company and its stockholders and conferring upon themselves excessive compensation in 2015 and they would be interested a demand regarding their decision to do so.

90.     Likewise, during 2016, while they were breaching their fiduciary duties by failing to execute their responsibilities to oversee the Company's risk and the truthfulness of its public disclosures, defendants Pien, Barron, Evnin, Klausner, Nelsen, and Wilderotter: (i) issued a proxy statement that misleadingly failed to disclose to stockholders that they had granted themselves excessive compensation in 2015 and that they were proposing a non-employee director compensation policy that did not contain meaningful limits on non-employee director compensation; and (ii) under the new policy awarded themselves excessive compensation of over $350,000 each.  According to the Harvard Report, during 2016, median non-employee director compensation at mid-cap companies was $200,000 and at large-cap companies was $260,000. During 2016, Juno's stock price fell 56% during the year and the Company's market capitalization was in the range of $3 billion for most of the year.  Yet, defendants Pien, Barron, Evnin, Klausner, Nelsen, and Wilderotter compensated themselves more than 75% more than their peers at mid-cap companies (the majority of whom surely had not presided over a 56% drop in share price during the year) and nearly 50% more than non-employee directors at large-cap companies.  As a result, defendants Pien, Barron, Evnin, Klausner, Nelsen, and Wilderotter breached their fiduciary duties by conferring upon themselves excessive compensation in 2016 and issuing a misleading proxy statement in support of doing so.  They would be interested a demand regarding their decision to do so.

29

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

91.     Plaintiff has not made any demand on the other shareholders of Juno to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Juno is a publicly held company with millions of shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I
### Breach of Fiduciary Duty as to All Individual Defendants

92.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

93.     Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Juno's business and affairs, particularly with respect to issues as fundamental as public disclosures.

94.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Juno.

95.     In breach of their fiduciary duties owed to Juno, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

30

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

96.     In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly represent the status of its core product, JCAR015, as being safe and effective when it was not.

97.     The Individual Defendants, as directors and officers of the Company, owed Juno the highest duty of loyalty.  The Individual Defendants knowingly or recklessly breached their duty of loyalty by allowing defendants Bishop and Harr to profit from undisclosed negative information by selling millions of dollars of stock at artificially inflated prices, by conferring incentive compensation on defendants Bishop and Harr when Bishop and Harr had been breaching their fiduciary duties and were not entitled to incentive compensation, by failing to conduct a legitimate investigation into the wrongdoing, and by failing to hold defendants Bishop and Harr to account for their wrongdoing.

98.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Juno has sustained and continues to sustain significant damages.  Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

<u>**COUNT II**</u>
<u>**Breach of Fiduciary Duty as to Defendants Pien, Barron, Evnin, Klausner, Nelsen, Wilderotter, and Tessier-Lavigne**</u>

99.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

31

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

100.    Each of defendants Pien, Barron, Evnin, Klausner, Nelsen, Wilderotter, and Tessier-Lavigne owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Juno's business and affairs.

101.    The conduct of defendants Pien, Barron, Evnin, Klausner, Nelsen, Wilderotter, and Tessier-Lavigne set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  Defendants Pien, Barron, Evnin, Klausner, Nelsen, Wilderotter, and Tessier-Lavigne intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Juno.

102.    In breach of their fiduciary duties owed to Juno, defendants Pien, Barron, Evnin, Klausner, Nelsen, Wilderotter, and Tessier-Lavigne willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

103.    Defendants Pien, Barron, Daniel, Evnin, Klausner, Nelsen, Wilderotter, and Tessier-Lavigne, as directors of the Company, owed Juno the highest duty of loyalty. Defendants Pien, Barron, Daniel, Evnin, Klausner, Nelsen, Wilderotter, and Tessier-Lavigne breached that duty by self-interestedly granting themselves excessive compensation as detailed herein.

104.    As a direct and proximate result of these defendants' breaches of their fiduciary obligations, Juno has sustained and continues to sustain millions of dollars in damages in the form of excessive director fees paid since 2015.

### COUNT III
### Violations of Section 14 of the Securities Exchange Act of 1934

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

105.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."   17 C.F.R. §240.14a-9.   Specifically, the Company's proxy statement filed April 24, 2016 violated §14(a) and Rule 14a-9 because it: (i) misrepresented the Board's actual activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; (ii) failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation; (iii) misrepresented the proposed non-employee director compensation policy as having meaningful limits on compensation when it did not; and (iv) failed to disclose that the compensation being conferred by Juno's non-employee directors on themselves was far in excess of the range provided to non-employee directors of similar sized, or even much larger, companies.

107.    In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

108.    The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement.   The 2016 proxy statement solicited shareholder votes for: (i) director nominees; (ii) approval of a stock purchase agreement; (iii) an advisory votes on executive compensation; (iv) ratification of the non-employee director

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

compensation policy; and (v) ratification of the appointment of the Company's independent auditor. The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

109. The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

### PRAYER FOR RELIEF

FOR THESE REASONS, plaintiff demands judgment on behalf of Juno as follows:

A. Declaring that plaintiff may maintain this action on behalf of Juno and that plaintiff is an adequate representative of the Company;

B. Against all defendants, jointly and severally and in favor of Juno for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duty and waste;

C. Declaring that the defendants have breached and/or aided and abetted the breach of their fiduciary duties to Juno;

D. Directing the defendants to take all necessary actions to reform and improve Juno's corporate governance and internal procedures to comply with applicable laws and to protect Juno and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1. a proposal to strengthen the Company's disclosure and financial controls;

34

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

3.      a provision to permit the shareholders of Juno to nominate at least three candidates for election to the Board; and

4.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.      Determining and awarding to Juno exemplary damages, including disgorgement of all profits, benefits, and other compensation obtained by defendants,  in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.      Awarding Juno restitution from defendants, and each of them;

G.      Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.      Granting such other and further equitable relief as this Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), plaintiff a trial by jury.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel:  (206) 223-2053
Fax:  (206) 343-9636

Dated: September 8, 2017

ZWERLING, SCHACHTER & ZWERLING, LLP

_s/_ _____Dan Drachler_____

Dan Drachler (WSBA #27728)
1904 Third Avenue
Suite 1030
Seattle, Washington 98101
Telephone: (206) 223-2053
Facsimile: (206) 343-9636
ddrachler@zsz.com

HARWOOD FEFFER LLP
Robert I. Harwood
Benjamin I. Sachs-Michaels
488 Madison Avenue, 8th Floor
New York, New York 10001
Telephone: (212) 935-7400
Facsimile: (212) 753-3630
rharwood@hfesq.com
mhouston@hfesq.com
bsachsmichaels@hfesq.com

GLANCY PRONGAY & MURRAY, LLP
Robert V. Prongay
Lesley F. Portnoy
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
rprongay@glancylaw.com
lportnoy@glancylaw.com

*Attorneys for Plaintiff*

36

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

Zwerling, Schachter, & Zwerling, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101-1170
Tel: (206) 223-2053
Fax: (206) 343-9636

DocuSign Envelope ID: 6BEB46AF-99A6-4EE4-ADC3-F990552DEAC5

## JUNO THERAPEUTICS, INC. VERIFICATION

I, David E. Mays, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 9/6/2017 _____

DocuSigned by:

David Mays

AAC44DB55D5B49A...

David E. Mays